## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

R.N., a minor, by and through her parent
and natural guardian, Ms. C.B., and Ms. C.B.
in her own right.

**Plaintiffs**,

v.

Seneca Valley School District,

**Defendant**.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 2:24-CV-70

**Jury Trial Demanded**

## COMPLAINT

As set forth below, Plaintiffs R.N., by and through her parent and natural guardian, Ms. C.B., and Ms. C.B. in her own right, by and through their undersigned counsel, Attorney Kristen Weidus and Ruder Law, LLC, claim violations of the United States Constitution, Title IX of the Education Amendments Act of 1972, 42 U.S.C. Section 1983, Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act of 1973, as well as the Pennsylvania Human Relations Act:

## Preliminary Statement

1.      This is a civil action brought by R.N., who is an individual with a disability, by and through her parent and natural guardian, Ms. C.B., and also Ms. C.B. in her own right.

2.      R.N., by and through her parent, Ms. C.B., allege violations of Title IX of the Education Amendments Act of 1972 ("Title IX"), 20 U.S.C. § 1681 (a), as well as Section 504 of the Rehabilitation Act of 1973 ("Section 504")(29 U.S.C. § 794) and its implementing

regulations, Section 1983 (42 U.S.C. § 1983), the United States Constitution, the Pennsylvania Human Relations Act (43 P.S. § 955), and Title II of the Americans with Disabilities Act ("ADA") (42 U.S.C. §§ 12101, *et seq.*).

3.      R.N. by and through her parent, Ms. C.B., seek all appropriate relief available and attorneys' fees pursuant to Title IX, the Pennsylvania Human Relations Act, Section 1983, Section 504, and the ADA.

4.      Plaintiffs allege that the Seneca Valley School District ("District") discriminated against Ms. C.B. by association, resulting in an additional violation of Section 504 and the ADA.

5.      Ms. C.B. is requesting monetary damages due to the District's deliberate indifference discrimination of Plaintiffs under Section 504 and the ADA.

6.      Ms. C.B. is also seeking all appropriate relief available and attorneys' fees pursuant to 42 U.S.C. Section 1983 ("Section 1983") due to the District's violation of their Fourteenth Amendment Liberty Interest.

## Parties

7.      Plaintiff, R.N. resided with her parent, Ms. C.B., in the Seneca Valley School District at all relevant times pertaining to the instant matter.

8.      R.N. was a tenth-grade student in the District's high school during the 2021-2022 school year, and an eleventh-grade student in the District's high school during the 2022-2023 school year.

9.      R.N. is a student with a disability who receives services and accommodations through a Section 504 Plan as the result of anxiety and PTSD diagnoses.

10.     Plaintiff Ms. C.B. is R.N.'s mother and natural guardian.

11.    Defendant, Seneca Valley School District, is an educational institution with multiple

locations, including an Administrative Office at 124 Seneca School Road, Harmony, PA

16037.  The District is a Local Education Agency ("LEA") and a recipient of federal

funds, and is therefore legally bound by the provisions of Title IX, Section 504, the ADA,

the Pennsylvania Human Relations Act, and Section 1983.

### Jurisdiction and Standing

12.    This Complaint seeks appropriate relief for violations and denial of equal access to

education pursuant to Section 504, 29 U.S.C. § 794, the ADA, 42 U.S.C. §§ 12101, et

seq, Title IX, 20 U.S.C. §1681(a), Section 1983, the Pennsylvania Human Relations Act,

and the Fourteenth Amendment.

13.    This action arises under the laws of the United States, and therefore this Court has

jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

14.    This Court is an appropriate venue for this cause of action pursuant to 28 U.S.C. §

1391(b).  The actions complained of took place in this judicial district, evidence and

pertinent records relevant to the allegations would be maintained in this judicial district,

and the Defendant is present and/or conducts affairs in this judicial district.

### Factual Allegations

### General Background Information

15.    Plaintiff R.N. was and is enrolled in the District.

16.    During the 2021-2022 school year, R.N. was fifteen-year-old sophomore who

participated in orchestra.

17.    During that school year, R.N. had not been identified as a student with a disability who

needed accommodations through a 504 Plan or Individual Education Program ("IEP").

## The May 1, 2022 Sexual Assault

18.  On May 1, 2022, R.N. was on a charter bus with District students as they returned home from an out-of-state orchestra trip.

19.  During the bus trip home, R.N. sat next to a male peer, S.W.

20.  Before this bus trip home, R.N. and S.W. did not know each other well, and they were not friends.

21.  R.N. and S.W. talked on the bus trip home.

22.  Eventually, R.N. fell asleep on the bus with a blanket over her lap and S.W. sitting next to her.

23.  R.N. was in and out of sleep for a period of the trip.

24.  R.N. woke up and S.W. had his hand on her knee.

25.  R.N. dozed off again. When she woke up some time later, S.W. had his hand over her clothes between her legs, and on her vagina.

26.  Initially, R.N. did not comprehend what he was doing.

27.  S.W. continued without her consent.

28.  R.N. was confused. R.N. did not know what to do or how to make him stop.

29.  R.N. shifted her body and then attempted to grab an item from a bag to move away from him.

30.  S.W. continued touching her.

31.  A field trip chaperone walked back to check on everyone.

32.  R.N. was scared, but she did not want to get S.W. in trouble.

33.  R.N. continued to use her body to try to move S.W.'s hand from her body, but she was unsuccessful.

34.   S.W. whispered something to R.N. to ask if she wanted him to stop.

35.   R.N. nodded her head "yes" and hoped he would stop.

36.   S.W. did not stop.

37.   R.N. then removed the blanket and said she was going to return to another seat.

38.   R.N. told her friends what happened, and her friends offered to help protect her.

39.   R.N.'s friends retrieved her luggage from the charter bus and transported it to her mother's vehicle.

40.   R.N. told Ms. C.B. about the sexual assault on the way home.

41.   While Ms. C.B. drove R.N. home after the trip, S.W. sent apologies in iMessages Instagram.

42.   R.N. and S.W. continued to communicate electronically about the incident on the bus. Statements made by S.W. to R.N. during these communications include but are not limited to, the following:

   a.   [in response to text from Complainant wherein Complainant stated that Respondent was touching and rubbing her while another student that Respondent had said he liked was seated nearby] "I know.. .1 don't know why I did. I just want you to know that I messed up. And I want to sincerely apologize. I don't know why I did it. I've never done that before and it was a shitty thing to do. I'm so sorry."

   b.   "I got carried away for no reason what so ever".

   c.   "Like genuinely [R.N.] ... I don't know why I did that. You didn't want that. And I'm so sorry. Truly am... I don't know what came over me or why I did it..."

   d.   "...I messed up [R.N.]. I don't know why I did it... I hurt you. I made you cry. I'm trying to do the opposite of that, always. I don't know why I thought you enjoyed that or wanted that. You clearly didn t and all I did was make you feel like shit."

   e.   "... All I want you and Tristan to know is I m genuinely sorry and a piece of shit. I listened to you, you listened to me and I took advantage of you"

f.   [in response to Complainant stating to Respondent that she did not know what was going through his brain when he did that] there wasn't anything. My body took over and I wasn't thinking".

g.   "I have been raised to treat a woman right and with respect. And until today I always have. I don't know why it happened. I wish I could give you an answer for that. Because in no way, shape or form did you deserve that"

h.   "I understand your pain, and that I understand that what I did was wrong and why it was wrong. I can't excuse my own behavior and that I understand that you can't either. There is no excuse that I can come up with that will make it okay, and I know this".

i.   "I've got no words that can truly make things better for what happened, like I literally just sexually assaulted someone. What the actual hell is wrong with me".

43.   Ms. C.B. encouraged R.N. to tell the District what happened to her.

44.   S.W. sent a few direct text messages following May 2, 2022, and R.N. did not respond.

**Events Following Sexual Assault**

45.   On May 2, 2022, R.N. told the guidance counselor about her sexual assault.

46.   R.N.'s guidance counselor explained that she was a mandated reporter, and she would be reporting this incident to the State.

47.   The guidance counselor and R.N. called Ms. C.B. to have Ms. C.B. pick up R.N. from school.

48.   On May 3, 2022, the Jackson Township police officer assigned to investigate called Ms. C.B. to introduce himself. He asked that the family forward S.W.'s iMessages and Instagram messages to him.

49.   For the next several days, law enforcement indicated they needed to determine what department had jurisdiction.

50.     Also on May 3, 2023, R.N. missed the high school Spring Orchestra Concert, because she was too upset to participate.

51.     R.N. wanted to perform, but the District indicated that the only protective measure they would take was to have R.N. sit away from the other students, including S.W., effectively drawing attention to R.N.

52.     R.N. asked the guidance counselor if the District would force S.W. to sit out of the performance.

53.     The District refused and said that they could not prevent him from attending and performing.

54.     By mid-May 2022, the State Police assigned an Investigator. They indicated that the Jackson Township police officer had not forwarded any evidence.

55.     Eventually, R.N. was scheduled for a forensic interview.

56.     During May and June, students discussed the allegations.

57.     R.N. was the subject of rumors and false allegations. Peers were inaccurately sharing her story.

58.     R.N. and S.W. remained in the same ninth period orchestra class. He was frequently near her or behind her.

59.     R.N. could not avoid S.W. and she was re-living the trauma every day.

60.     S.W. tapped her shoulder on one occasion to discuss a group project.

61.     Not one individual from the District asked R.N. how she was doing, if she needed support, or what she might need to feel safe.

62.     The District failed to ask R.N. if she felt safe in ninth period orchestra class with S.W.

63.     The District refused to investigate or implement any disciplinary measures against S.W., indicating that they could not take any action until the criminal investigation concluded.

64.     On at least one occasion, R.N. felt triggered in S.W.'s presence, and she had to leave orchestra class crying.

65.     In the hallways, peers were talking about R.N. and S.W., and they made allegations about R.N.

66.     Peers spread false rumors about R.N.'s willingness to engage in sexual activities on a school bus.

67.     In addition, R.N. heard peers discuss her breasts.

68.     R.N. told her guidance counselor about the bullying and harassment.

69.     The District failed to offer support, protection, or guidance.

70.     As a result, R.N. became depressed.

71.     R.N. quit her job, and her hygiene and social life suffered.

72.     R.N. obtained a temporary "Sexual Violence Protection" Order by the Court.

73.     R.N. provided a copy to the District.

**Summer 2022**

74.     Over the summer, R.N. started mental health therapy.

75.     R.N, was diagnosed with anxiety, depression, and post-traumatic stress disorder.

76.     R.N. and Ms. C.B. were involved in two legal matters because of S.W. sexually assaulting R.N.

77.     One was the previously mentioned Sexual Violence Protection ("SVP") Order.

78.     SVP hearings were continued multiple times.

79.     In the meantime, the temporary protective order remained in effect.

80.     The State also filed criminal charges against S.W.

81.     Upon information and belief, in July 2022, at the criminal hearing S.W. admitted guilt and entered a consent decree.

82.     R.N. gave a victim impact statement.

83.     By August 2022, a different Judge held R.N.'s SVP hearing.

84.     Upon information and belief, S.W.'s juvenile criminal record was sealed, and it was not presented to the Judge.

85.     Upon information and belief, S.W. continued to have a "no contact order" with R.N. through his juvenile criminal matter.

86.     During this hearing, R.N, was scolded for a social media post that she wrote to explain what happened to her, even though R.N. did not identify S.W. as her perpetrator.

87.     Upon information and belief, S.W.'s attorney claimed that if R.N. was truly afraid she would dress differently, and she wouldn't tell her story or discuss how she was feeling on social media.

88.     The Judge denied the SVP order.

89.     R.N. prepared for her junior year in the District.

90.     R.N. was concerned that she and her perpetrator would remain in the same orchestra class.

91.     The District recommended R.N. for a more advanced orchestra class called "chamber orchestra."

92.     R.N. was not interested in that class. R.N. enjoyed the traditional class, and she did not want to participate in the more intense and competitive chamber orchestra program.

93.   Upon information and belief, the District considered placing S.W. in the chamber orchestra class.

94.   This upset R.N., because she knew S.W. previously auditioned for chamber orchestra and he was not accepted into that program. This meant that the District would effectively reward S.W. for sexually assaulting R.N. by placing him in an advanced course without him qualifying.

**The 2022-2023 School Year**

95.   In late August 2023, R.N. began her junior year.

96.   R.N. was able to take the traditional orchestra class without S.W. in the same class.

97.   R.N. did not have any classes with S.W.

98.   However, the District failed to implement any protective measures for R.N. to ensure her safety and stability.

99.   Plaintiffs received no indication that the District intended to investigate or implement any discipline against S.W. on its own volition, despite S.W.'s criminal investigation and charges being resolved over the summer.

100.  By September 2022, the District failed to independently investigate or initiate a Title IX investigation.

101.  The District further failed to implement even one disciplinary measure against S.W. following the May 1, 2022 incident, and following S.W.'s admissions and consent decree in his juvenile delinquency matter.

102.  The District failed to ask R.N. and/or Ms. C.B. what R.N. might need to feel supported and to be able to feel safe on school grounds.

103.   The District failed to ask R.N. if she might need accommodations or support to access her education in light of the known sexual assault.

104.   R.N. told her guidance counselor about statements her peers were making about R.N. being at fault.

105.   R.N.'s grades and attendance were impacted immediately.

106.   R.N. was having night terrors almost every night.

107.   R.N. also had periods of insomnia.

108.   R.N. became fearful of peers, and she had anxiety about sitting next to any person on any bus.

109.   The District failed to acknowledge R.N.'s suffering or inquire about the dramatic change in her school attendance, participation, and performance.

110.   Instead of initiating an investigation or offering support, the District told R.N. and Ms. C.B. that they would only complete a Title IX investigation if the family filed a complaint at the conclusion of S.W.'s criminal hearing.

111.   R.N. formally requested a Title IX investigation from a District School Resource Officer.

112.   In response, the School Resource Officer told R.N. that they were not aware of any incidents involving S.W., that S.W. was a "good kid," and they did not know what she wanted them to do.

113.   R.N. was again left without support or information on how to initiate a Title IX investigation.

114.   R.N.'s parent, Ms. C.B., found contact information for Mr. Ashley Porter, the District's Title IX representative. Ms. C.B. reached out to Mr. Porter.

115.   On or around September 1, 2022, after the family made a formal Title IX complaint, the District agreed to conduct an investigation.

116.   In the meantime, R.N. continued to have episodes of anxiety, panic, and depression. She missed school and activities she once enjoyed.

117.   R.N. could not go to homecoming, because S.W. and his family would be there, and she felt unsafe and unsupported.

118.   During the Title IX investigation, Plaintiffs were responsive and cooperative.

119.   The District, however, failed to require R.N.'s perpetrator to answer relevant questions to the investigation, allowing the perpetrator's attorney to claim a privilege that does not exist in law.

120.   On October 1, 2022, the District produced a three-hundred and fourteen (314) page investigative report.

121.   The District indicated that this report would be used by the decision-maker to make a determination of responsibility.

122.   The District's initial position was that the matter did not meet the definition of Title IX sexual harassment.

123.   In this investigative report, the District went to great lengths to discuss the credibility and remorsefulness of S.W.

124.   It then went on to question R.N.'s credibility and sincerity because she was clearly smiling in social media posts, and because she used social media to share her personal story and experience as a survivor of a sexual assault.

125.   The District's investigator, Mr. Porter, recommended "no action as it relates to this matter," and that "in the event that the district institute a remedy, it is the opinion and

respectful request of Respondent that the district institute a remedy that will not result in any way in disrupting his education in his senior year of high school any further than it already has been disrupted by this matter."

126. The District's investigative report caused Plaintiffs stress, anxiety, and fear.

127. Plaintiffs were physically ill because of the stress they felt while reading Mr. Porter's initial summary and recommendations.

128. Plaintiffs felt misunderstood, misrepresented, and unprotected.

129. R.N. struggled to cope with the District's position.

130. The District continued to offer her no support in school.

131. Then, on October 6, 2022, the District's Title IX investigator reached out to Ms. C.B. to request that R.N. take a longer route to her Period 8 class to avoid S.W., rather than asking S.W. to take a different route or to take any steps to avoid R.N.

132. The District initially indicated that a written determination of responsibility would be finalized by Dr. Marie Palano (decision-maker) on or after Saturday, October 8, 2022 at 6pm.

133. On October 19, 2022, the District closed the Title IX investigatory record.

134. Later that day, the District indicated that due to the "various legal issues that have been raised by the parties," the District determined that the decision-making responsibilities would be turned over to Attorney Donald Palmer.

135. On November 1, 2022, Plaintiffs learned that S.W.'s parent became the President of the District Orchestra Organization. This meant S.W.'s parent would likely attend the Spring Orchestra Field Trip and she would also be at orchestra meetings and rehearsals.

136.   R.N. reached out to her orchestra teacher, Ms. Sarah Miller, to inquire about dropping orchestra class.

137.   Ms. Miller responded to R.N. by saying "Do not spiral about this, I would like to talk to you, it will be okay."

138.   On November 3, 2022, the Plaintiffs, through counsel, requested multiple accommodations, supports, and services to ease R.N.'s stress and anxiety in school, and to help her access her education.

139.   The family further requested an evaluation to determine R.N.'s eligibility under Section 504 of the Rehabilitation Act of 1973.

140.   On November 10, 2022, the District issued a permission to evaluate R.N. to determine her eligibility under Section 504.

141.   On or around November 14, 2022, Ms. C.B. provided documentation of R.N.'s diagnosis from R.N.'s therapist.

142.   R.N.'s therapist, Kendra Mara-Roman from Cranberry Psychological Center, shared that R.N. had a diagnosis of Post Traumatic Stress Disorder ("PTSD") and anxiety.

143.   R.N. continued to miss school, miss class, and leave school early, because she was overwhelmed, upset, and without support to get through the school day.

144.   On November 18, 2022, the District implemented a Section 504 Service Agreement to address R.N.'s needs for supports and accommodations as a student with PTSD and anxiety.

145.   On November 29, 2022, the District provided a Confidential Written Determination of Responsibility after completing a Title IX investigation. This report was written by Attorney Donald J. Palmer, and it was dated November 21, 2022.

146. As the Title IX Decision-Maker, Attorney Palmer found that R.N.'s complaint of Title IX sexual harassment under Policy 103 was founded.

147. Furthermore, Attorney Palmer noted, "Seneca Valley Board District Policy 218, titled 'Student Discipline,' establishes disciplinary guidelines that may result in disciple being imposed upon a student for student misconduct. The Policy sets forth levels of infractions ranging from Level I to Level III offenses. Level III offenses include, inter alia, engaging in sexual acts and Title IX sexual harassment. The District's Student Handbook also prohibits Title IX sexual harassment as well as behavior that endangers health, safety, and welfare of others during extracurricular activities. Respondent's actions on the bus home on the orchestra trip on May 1, 2022 violate the District's discipline regulations."

148. He recommended that "the District should impose disciplinary sanctions on Respondent in accordance with Policy 103, Board Policy 218, and the Student Handbook, subject to Respondent being afforded all requisite due process."

149. Ultimately, S.W. was disciplined and received a thirty-day expulsion (inclusive of the 10-day suspension imposed by school administration). S.W. was required to participate in virtual education, and he was not permitted to participate in the Spring Orchestra field trip to Nashville Tennessee or the Orchestra Spring Concert.

**Ongoing Impact**

150. R.N. continued to flounder at school.

151. R.N.'s grades and attendance were declining.

152. The District was not offering R.N. any support or accommodations.

153. Upon information and belief, the District failed to implement numerous measures in R.N.'s 504 Plan.

154. R.N. was being denied equal access to the District's education, programs, and activities.

155. On February 19, 2023, the District confirmed that S.W. would not be participating in the spring orchestra concert.

156. On February 24, 2022, R.N. learned that she might not be permitted to attend the orchestra field.

157. Ms. C.B. heard that it was due to a late payment.

158. However, C.B. had confirmation that she still had time to submit payment.

159. She was also aware that other parents had not yet submitted payment, and they were given additional time.

160. The differential treatment caused Plaintiffs additional and unnecessary stress.

161. R.N. felt that her relationship with her orchestra teacher was now strained. R.N. felt like a "problem child."

162. R.N. noticed that peers would roll their eyes at her.

163. R.N. believed that her teachers and peers felt that she was overreacting.

164. R.N. felt as if she had to defend her trauma to District staff who she once trusted.

165. R.N. was ultimately permitted to submit a payment and attend the orchestra trip.

166. However, R.N. felt mistreated by staff and teachers.

167. R.N. feared that she would be further bullied by peers.

168. R.N. also believed that S.W.'s parent was likely a chaperone on the trip.

169. R.N. decided to protect her mental health and wellbeing and not participate in the trip.

170. To date, the District failed to implement the supports and services in R.N.'s 504 Service Plan.

171. R.N. was at risk of not completing her Junior year.

172. Ms. C.B. and R.N. believed that R.N. would only be able to finish her junior year if she did online work over the summer.

173. R.N. was earning straight As in her in person classes.

174. The District recommended that R.N. participate in more classes in person, and fewer classes online.

175. Plaintiffs were concerned that the District offered additional accommodations online, including a reduced workload.

176. The District indicated that R.N. would not have a reduced workload for her in-person classes.

177. This meant that by returning in-person, R.N. would have an increased workload and less support.

178. The District did not check on R.N. one time in person to see how she was doing emotionally or academically, despite this being a clear supportive service in R.N.'s 504 Plan.

179. On February 27, 2023, Plaintiffs filed a complaint with the Pennsylvania Human Resources Commission.

180. Plaintiffs alleged that the District discriminated against R.N. based on sex and disability, that the District retaliated against R.N. and Ms. C.B. after they filed a formal Title IX complaint, and the District discriminated against Ms. C.B. because of her association with R.N..

181. Concerned about R.N.'s ability to successfully complete her junior year, Ms. C.B., through Counsel, asked the District to implement R.N.'s 504 Plan as written, including check-ins.

182.   Notably, Ms. C.B. asked for the District to reduce R.N.'s workload to core content for all courses, online and in person.

183.   Ms. C.B. further asked that the District offer additional cyber/paraprofessional help, as indicated by the existing 504 Plan.

184.   Ms. C.B. also asked that R.N.'s teachers be aware of the 504 Plan and the need for additional support.

185.   Lastly, the 504 Plan indicated a need for block scheduling. The block schedule was set to be implemented in January 2023, but as of February 27, 2023, it had not started.

186.   On March 27, 2023, the District reached out to inform Plaintiffs that S.W. would return to school in person on March 28, 2023.

187.   The District indicated that it would implement the following supportive measures: (1) both parties remain in separate classes, (2) both parties are prohibited from contacting each other, and (3) school counselors are available to both parties at their discretion.

188.   S.W. returned to in-person learning on or around March 28, 2023.

189.   R.N. struggled to cope with S.W.'s presence at school.

190.   By mid-April 2023, R.N. pulled out of in person school full-time, because her trauma responses returned after S.W. returned.

191.   She struggled to work through her cyber curriculum.

192.   R.N. was no longer able to participate in school activities she once loved, including orchestra, following the sexual assault and S.W.'s return to school.

193.   R.N. could not safely and comfortably participate in the Orchestra Spring Concert.

194.   On May 1, 2023, R.N. learned that S.W. was at a Spring Concert rehearsal.

195. Peers informed R.N. that Ms. Sarah Miller discussed S.W.'s return and participation in the orchestra practice to prepare for concert.

196. Upon information and belief, Ms. Miller was made aware that S.W. was not permitted to participate in the Orchestra Spring Concert as part of S.W.'s Title IX discipline.

197. Ms. C.B. immediately informed the District's Title IX investigator, Mr. Ashley Porter.

198. In addition, R.N. contacted Ms. Miller to inquire about S.W.'s participation in the rehearsal and spring concert.

199. On May 2, 2023, Plaintiffs learned that R.N.'s name was removed from the Spring Concert Program, and S.W.'s name was put in.

200. Upon information and belief, S.W. did not end up performing in the Orchestra Spring Concert.

201. However, as a result of the District's actions against R.N. throughout the 2022-2023 school year, their clear support of S.W., and their failure to support R.N., R.N. was unable to participate in the school activities she loved, and she was unable to feel safe and protected on school property.

202. R.N. had difficulty sleeping and continued to experience and suffer from post-traumatic stress disorder and anxiety.

203. R.N. became separated from most of her friends, and she missed opportunities to socialize with peers during and after school.

204. To date, R.N. feels uncomfortable leaving her house, as she worries that social outings she once enjoyed will be attended by students who have bullied and harassed her.

205. R.N. continues to be unable to use any public or school transportation,

206.    R.N.'s ongoing mental suffering based on her experience at the District continues to have a profound effect on her parents and siblings.

207.    Ms. C.B. struggles to sleep, as she is worried about her daughter.

208.    Ms. C.B. worries about leaving R.N. alone because R.N. regularly experiences panic and anxiety.

209.    Ms. C.B. missed work to drive R.N. to therapy appointments and to tend to R.N. throughout the school day when she had periods of intense anxiety and panic.

210.    Despite R.N.'s desire to return to school in person, her trauma and anxiety prevented her from attending safely.

211.    R.N. was essentially forced to participate in the District's cyber program.

212.    R.N.'s insomnia and need to address ongoing mental health impacted her ability to complete schoolwork in a timely manner.

213.    R.N. may have to complete cyber curriculum over the summer to successfully finish her junior year.

### COUNT I: Violation of Title IX of the Education Amendments of 1972
### *All Plaintiffs v. Seneca Valley School District*

214.    The averments set forth in the preceding paragraphs are incorporated by reference here as though fully set forth at length.

215.    Title IX of the Education Amendments Act of 1972 provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

216.    Student-to-student harassment claims are actionable under Title IX.   *See MDB v. Punxsutawney Christian School,* 386 F.Supp.3d 565, 577 (W.D.Pa. 2019).

217.   A plaintiff must prove five elements to recover under Title IX based on peer or student-to-student harassment: (1)  School district received federal funds; (2) sexual harassment occurred; (3) the harassment took place under circumstances in which the school exercised substantial control over both harasser and context in which harassment occurred; (4) the defendant had actual knowledge of the harassment; (5) the school district was deliberately indifferent to the harassment; and (6) harassment denied plaintiff access to educational opportunities or benefits.  *Doe v. Pennridge School District*, 413 F. Supp. 3d 393 (E.D. Pa. 2019).

218.   To recover under Title IX based on peer or student-to-student harassment, "a plaintiff must establish sexual harassment of students that is so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that the victim-students are effectively denied equal access to an institution's resources and opportunities."  *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 651 (1999).

219.   For liability to attach to a school district, the district's response to the harassment or lack thereof must be "clearly unreasonable in light of the known circumstances." *Id*. at 648.

220.   The Supreme Court addressed the "severe, pervasive, and objectively offensive" element and stated that "[t]he most obvious example of student-on-student sexual harassment capable of triggering a damages claim would thus involve the overt, physical deprivation of access to school resources."  *MDB*, 386 F.Supp.3d at 577 (quoting *Davis,* 526 U.S. at 650).

221.   The Court further used the example of "a case in which male students physically threaten their female peers every day, successfully preventing the female students from using a

particular school resource—[for instance,] an athletic field or a computer lab." *MDB*, 386 F.Supp.3d at 577 (quoting *Davis,* 526 U.S. at 650-651).

222.   "Physical exclusion" from a classroom "is not necessary to demonstrate a student was deprived of an educational opportunity on the basis of her gender" because courts can also consider whether the peer-to-peer harassment had a negative effect on the plaintiff's ability to receive an education, such as a decline in the student's grades or mental health. *MDB*, 386 F.Supp.3d at 577 (quoting *Davis,* 526 U.S. at 631-654).

223.   The District violated R.N.'s rights under Title IX because she was "excluded from participation in" and "denied the benefits of" and "was subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).

224.   Seneca Valley School District is a Title IX funding recipient.

225.   Many officials, including the Principal, Assistant Principal, Title IX representative, School Resource Officer, Guidance Counselor, and R.N.'s teachers, had the authority to take corrective action and had actual knowledge that R.N. was being sexually harassed and bullied by her peers following the May 1, 2022 sexual assault.  *MDB,* 386 F.Supp.3d at 577 (citing *Gebser v. Lago Vista Ind. Sch. Dist.*, 524 U.S. 274 (1998)).

226.   District student S.W.'s sexual assault, the peer-on-peer harassment and bullying that followed, and the District's failure to implement and protect R.N. during and after the Title IX investigation  was "so severe, pervasive, and objectively offensive" that R.N. was effectively denied equal access to the District's resources and opportunities.  *MDB,* 386 F.Supp.3d at 577 (quoting *Davis,* 526 U.S. at 650).

227. Further, the District cooperated with law enforcement in their investigation of S.W. and his sexual assault of R.N. on a school field trip. This means that the District had actual knowledge of R.N.'s assault months before the formal Title IX investigation.

228. R.N. spent as much time as possible hiding in the orchestra practice room, the bathroom, or she remained at home to escape the bullying and harassment from her peers and to avoid seeing S.W..

229. R.N.'s grades declined, and her mental health suffered as a result of the May 1st sexual assault.

230. Furthermore, the resulting bullying and harassment by her peers, the District's failure to implement appropriate discipline against S.W., and the District's failure to support and protect R.N. prevented her from accessing in-person education and participating in school activities.

231. R.N. had to drop her in-person classes and enroll in the District's cyber program to keep up with her curriculum because attending school triggered her trauma and she feared ongoing bullying during the school day.

232. Seneca Valley School District acted with "deliberate indifference to known acts of peer sexual harassment" in a manner that was "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648.

233. After the conclusion of the Title IX investigation and S.W.'s return to in person learning, R.N. was unable to attend classes in person due to her post traumatic stress disorder and anxiety symptoms.

234. R.N. began receiving virtual instruction through the District in April 2023.

235.    R.N.'s anxiety increased while participating in virtual instruction, as she worried about her grades and inability to complete her work in a timely manner.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court award Plaintiffs all remedies available under Title IX, including monetary damages, attorneys' fees and costs, and all other relief this Honorable Court deems appropriate.

## COUNT II: Unconstitutional Policies and Customs Pursuant to 42 U.S.C. Section 1983
### *(Monell)*
### *R.N. vs. Seneca Valley School District*

236.    The averments set forth in each of the preceding paragraphs are incorporated by reference here as though fully set forth at length.

237.    Local government may be sued under Section 1983 "when execution of a government policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts injury." *Monell v. New York City Dept. of Social Services,* 436 U.S. 658 (1978).

238.    R.N.'s right to access the educational opportunities, programs, services, and supports provided to all students was interfered with as a result of Defendant's failure to adequately and appropriately train its employees.

239.    Defendant encouraged, tolerated, ratified and was deliberately indifferent to patterns, practices, and customs, and to the need for more or different training, supervision, investigation, or discipline in the areas of: appropriate responses to reports of gender-based harassment and bullying.

240.    Even following reports by Plaintiffs, Defendant failed to take appropriate action to address the gender-based discrimination and bullying R.N. was subjected to by her peers.

241.    As a result, R.N. did not have equal access to her education.

242.    R.N. felt unsafe at school, she was unable to participate in educational activities she once

enjoyed, and she was constructively forced into the District's cyber program due to her

anxiety and fear while on school grounds.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court award Plaintiff all

remedies available under Section 1983 for these violations, including monetary damages,

attorneys' fees and costs, and all other relief this Honorable Court deems appropriate.

### COUNT III: Violation of Title II of the Americans with Disabilities Act
*R.N. v. Seneca Valley School District*

243.    The averments set forth in the preceding paragraphs are incorporated by reference here as

though fully set forth at length.

244.    Section 504 prohibits disability discrimination by recipients of federal funds. The statute

provides that:

> No otherwise qualified individual with a disability in the United States . . . shall,
> solely by reason of her or his disability, be excluded from the participation in, be
> denied the benefits of, or be subjected to discrimination under any program or
> activity receiving Federal financial assistance or under any program or activity
> conducted by any Executive agency[.]. 29 U.S.C. § 794(a).

245.    Section 202 of the ADA similarly states:

> "[N]o qualified individual with a disability shall, by reason of such disability, be
> excluded from participation in or be denied the benefits of the services, programs,
> or activities of a public entity, or be subjected to discrimination by any such
> entity."

> 42 U.S.C. § 12132.

246.    The same standards govern both Section 504 and the ADA claims.  *S.H. ex rel. Durrell v.*

*Lower Merion School District*, 729 F.3d 248, 260 (3d Cir. 2013).  Thus, Counts II and III

will be considered together here.

247. Claims for compensatory damages under Section 504 and the ADA require a finding of intentional discrimination.  *Id.* at 261.

248.  "Deliberate indifference" may satisfy a claim for compensatory damages under Section 504 and the ADA.  *Id.* at 263.

249. Deliberate indifference requires both (1) "knowledge that a harm to a federally protected right is substantially likely," and (2) "a failure to act upon that likelihood." *Id*. at 261 (quoting *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001).

250. The deliberate indifference standard "'does not require a showing of personal ill will or animosity toward the disabled person.'" *S.H.,* 729 F.3d. at 263 (citing *Meagley v. City of Little Rock*, 639 F.3d 384, 389 (8th Cir.2011)) (quoting *Barber v. Colo. Dep't of Revenue*, 562 F.3d 1222, 1228–29 (10th Cir.2009)).

251. "The deliberate indifference standard best reflects the purposes of § 504 while unambiguously providing the notice-and-opportunity requirements of Spending Clause legislation. A lower standard would fail to provide the notice-and-opportunity requirements to RA defendants, while a higher standard—requiring discriminatory animus—would run counter to congressional intent as it would inhibit § 504's ability to reach knowing discrimination in the absence of animus." *S.H.,* 729 F.3d. at 265 (quoting *Liese v. Indian River Cnty. Hosp. Dist*., 701 F.3d 334, 348 (11th Cir.2012).

252. An individual with a disability is defined under Section 504 and the ADA as a person who has a physical or mental impairment that substantially limits one or more major life activities.

253. The District discriminated against R.N. due to her disability.

254. The District identified R.N. as a student with a disability when it implemented a Section 504 Plan to address R.N.'s post-traumatic stress disorder and anxiety, as required, pursuant to the IDEA and Section 504.

255. Many of R.N.'s teachers, the Guidance Counselor, and the Principal were aware for months that R.N. could not concentrate in her classes due to her ongoing mental suffering related to the sexual assault and bullying she experienced.

256. This ongoing mental suffering caused R.N.'s attendance and grades to decline.

257. As R.N.'s mental health interfered with her ability to access her education, she should have received Accommodations and Related Services in her existing 504 Plan and an Evaluation Report to determine whether she required Specially Designed Instruction through an Individual Education Program ("IEP") to address the post-traumatic stress disorder and anxiety.

258. Without this support, R.N. was not able to succeed in the school setting. R.N. was denied the benefits of the program in that she was not able to access her education due to her disability related to her mental health.

259. Following the sexual assault, R.N.'s anxiety increased, as she worried about her grades and inability to complete her work. R.N. also continued to be anxious about the students who bullied and harassed her.

260. Her parent then made the difficult choice to permit R.N. to withdraw from in person learning and enroll her in the District's Cyber program.

261. Defendant Seneca Valley School District acted with deliberate indifference in violation of Section 504 and the ADA.

262.   The District, including its Principal, School Resource Officer, Guidance Counselor, Title IX Investigator, and many teachers, had knowledge that a harm to R.N.'s federally protected right was substantially likely and failed to act upon that likelihood.

263.   The District had knowledge that R.N. was being sexually harassed and bullied by her peers for months following the sexual assault but failed to act upon this knowledge.

264.   Furthermore, R.N. was an active participant in Orchestra. She was sexually assaulted on an out-of-state orchestra field trip, and she planned to continue participating in orchestra activities and improving her orchestra skills.

265.   It was important to R.N. to continue and improve her orchestra skills but she was unable to participate due to the District's failure to support her.

266.   R.N.'s lack of access to any educational programming resulted in a harm to R.N., including cognitive, psychological, and socio-relational damages.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court award Plaintiffs all remedies available under Section 504 and the ADA, including monetary damages, attorneys' fees and costs, and all other relief this Honorable Court deems appropriate.

### COUNT IV: Violation of Title II of the Americans with Disabilities Act
*Ms. C.B. v. Seneca Valley School District*

267.   The averments set forth in the preceding paragraphs are incorporated by reference here as though fully set forth at length.

268.   Plaintiffs note these claims are presented as an original action.

269.   The same standards govern both Section 504 and the ADA claims.  *S.H.*, 729 F.3d at 260.

270.   Thus, Counts II and III will be considered together here.

271.   A plaintiff asserting an associational discrimination claim under Section 504 and Title II of the ADA must plausibly allege:

(1) a logical and significant association with an individual with disabilities; (2) that a public entity knew of that association; (3) that the public entity discriminated against them because of that association; and (4) they suffered a direct injury as a result of the discrimination. *Schneider v. Cnty. Of Will*, 190 F. Supp. 2d 1082, 1091 (N.D. Ill. 2002) (citing 28 C.F.R. § 35.130(g)).

272.   Ms. C.B. is R.N.'s parent.

273.   The District clearly knew of this association.

274.   R.N. was a student with a disability related to her mental health.

275.   Many of R.N.'s teachers and Guidance Counselor were aware for months that R.N. could not concentrate in her classes due to her anxiety and PTSD symptoms.

276.   This ongoing mental suffering caused R.N.'s grades to decline.

277.   As R.N.'s mental health interfered with her ability to access her education, she should have received additional supports and accommodations to address the anxiety and trauma.  Without this support, R.N. was not able to succeed in the school setting.

278.   The District discriminated against Ms. C.B. because of her association with R.N. by continuously failing to provide sufficient supervision and support for her mental health, despite Ms. C.B.'s repeated efforts and requests, to permit R.N. to access her education.

279.   The District ignored Ms. C.B., which directly resulted in R.N. being denied adequate safety and protection, as well as access to her education.  This also prevented Ms. C.B. from effectively participating as a member of C.B.'s 504 Plan Team.

280.   The District acted with deliberate indifference toward Plaintiff in violation of Section 504 and the ADA.

281.   As a result of the anxiety and stress she experienced because of the incidents described in this Complaint, Ms. C.B.'s mental health suffered.  Ms. C.B. suffered a direct injury as a result of the discrimination.

282.   Ms. C.B. suffered additional direct injuries as a result of the discrimination.  She was forced to witness her child suffer because of the District's actions, which significantly impacted her mental and physical health.  Although she had previously experienced occasional panic attacks prior to the incidents described herein, Ms. C.B. now has several panic attacks each week. She has also been forced to take two additional medications to manage her increased anxiety.

283.   She has developed insomnia, and just recently her therapist recommended that she begin seeing a psychiatrist. In 2019 she suffered a stroke, and as a result has to carefully monitor her blood pressure. The stress and anxiety that Ms. C.B. has endured as a result of the District's actions resulted in a sharp increase in her blood pressure, and she has been forced to double her medication to treat this condition as a result.

284.   Ms. C.B.'s diagnosed irritable bowel syndrome was aggravated due to her daughter being bullied, her sexual assault, and her subsequent mental suffering following the sexual assault.

285.   Ms. C.B. was afraid to leave R.N. alone because she worried about R.N.'s mental health and stability.

286.   Ms. C.B. had to miss work frequently to pick R.N. up early from school, to stay with R.N. when she could not attend school, to drive R.N. to various doctor and therapy appointments, and to be there for R.N. when she needed help. Today, Ms. C.B.'s daily life continues to be interrupted by the emotional and mental anguish she continues to experience.

287. Ms. C.B. eventually made the difficult decision to transfer R.N. to the District's cyber program because R.N.'s fear of seeing S.W. and the other students who bullied and harassed her made it impossible for her to feel safe in the school setting.

288. Therefore, Plaintiff C.B. has suffered discrimination on the basis of her association with R.N., a child with a disability, due to the District's actions.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court find that the District discriminated against Ms. C.B. based on her association with an individual with a disability and award Plaintiff all remedies available under Section 504 and the ADA, including monetary damages, attorneys' fees and costs, and all other relief this Honorable Court deems appropriate.

## COUNT V: Violation of Fourteenth Amendment Liberty Interest
### *Ms. C.B. v. Seneca Valley School District*

289. The averments set forth in the preceding paragraphs are incorporated by reference here as though fully set forth at length.

290. To state a due process claim under Section 1983, a plaintiff 'must identify a 'recognized liberty or property interest within the purview of the Fourteenth Amendment and show that they were intentionally or recklessly deprived of that interest, even temporarily, under state law.'" *Anspach ex rel. Anspach v. Cty. of Phila., Dept. of Publ. Health*, 503 F.3d 256, 262 (3d Cir. 2007) (quoting *Griffith v. Johnston*, 899 F.2d 1427, 1435 (5th Cir. 1990)).

291. "The interest of parents in the care, custody, and control of their children–is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Gran*ville, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000).

292.   The Court has also recognized a "cognizable liberty interest in preserving the life and physical safety of [a minor child] ... a right that logically extends from [a parent's] recognized liberty interest in the custody of his children and the maintenance and integrity of the family." *Est. of Bailey by Oare v. York Cty., 768 F.2d 503 (3d Cir. 1985), abrogated by DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 109 S. Ct. 998, 103 L. Ed. 2d 249 (1989).

293.   Ms. C.B.  possessed a liberty interest, guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution, in the parenthood and companionship of her child, R.N., and the maintenance and integrity of their family.

294.   The actions of the District in failing to adequately support R.N. resulted in her being victimized by other students, and it was the proximate cause of the loss and diminution of these rights.

295.   Ms. C.B.'s mental and physical health declined, as more specifically described herein, which were proximately caused by the conduct of the District.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court award Plaintiff all remedies available under Section 1983 for these violations, including monetary damages, attorneys' fees and costs, and all other relief this Honorable Court deems appropriate.

## <u>COUNT VI: VIOLATION OF THE PENNSYLVANIA HUMAN RELATIONS ACT</u>
*R.N. v. Seneca Valley School District*

296.   The averments set forth in each of the preceding paragraphs are incorporated by reference here as though fully set forth at length.

297.   R.N., as a student with a disability, is a member of a protected class.

298.   The District is a public accommodation as defined by the Pennsylvania Human Relations Act.

299.     R.N. was denied the emotional support that she required, despite the District's explicit knowledge of her need for the same.

300.     The District also failed to appropriately investigate R.N.'s reports of sexual harassment and bullying, electing instead to shield the perpetrator from adverse action until counsel was retained.

301.     The District's actions violated Section 5(i)(1) of the Pennsylvania Human Relations Act.

302.     On February 27, 2023, Ms. C.B. filed an Education Discrimination Complaint with the Pennsylvania Human Rights Commission (PHRC). This Complaint alleged that the District inappropriately discriminated against R.N. based on her gender and disability status.

303.     On November 7, 2023, the PHRC sent a letter to Ms. C.B. indicating that insufficient evidence had been produced to establish discrimination.

304.     Thus, Plaintiffs have exhausted the required administrative procedures.

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court award Plaintiffs all appropriate remedies available under the Pennsylvania Human Relations Act for these violations.

## REQUEST FOR RELIEF

Wherefore, Plaintiffs respectfully request that this Honorable Court enter an Order:

1.     Assuming jurisdiction of this case;

2.     Awarding monetary damages to Plaintiffs to address the emotional, mental, and physical anguish and distress experienced as a result of the District's violations of the United States Constitution, Section 1983, ADA, Pennsylvania Human Relations Act, Section 504, and Title IX;

3.      Awarding attorneys' fees and costs under the ADA, Pennsylvania Human

Relations Act, Section 504, and Title IX;

4.      Awarding Plaintiffs all remedies available under the United States

Constitution and Section 1983 for these violations, including monetary

damages, attorneys' fees and costs, and all other relief this Honorable Court

deems appropriate;

5.      Declaring that the District's actions and omissions constituted discrimination

against Plaintiff C.B. based on her association with an individual with a

disability under Section 504 and the ADA; and

6.      Granting any other appropriate and necessary relief as the Court deems

appropriate, including monetary damage, punitive and exemplary damages,

and attorneys' fees.



Respectfully Submitted,

RUDER LAW, LLC

*/s/ Kristen Weidus*
Kristen C. Weidus, Esq.
PA Attorney ID 313486
One Oxford Center
301 Grant Street, Suite 270
Pittsburgh, PA 15219
Telephone: (412) 281-4959
Fax: (412) 291-1389
Email: kristenweidus@ruderlaw.com


Date: January 18, 2024